Yes, Your Honor. Case number 19-2364, Northern Iowa, Larenzo Irvin v. Tyler Richardson, et al. All right. I think we're ready to go, Mr. Fergs. Thank you, Your Honor. I may please the court counsel. It's my privilege and my honor to represent Larenzo Richardson after his case was dismissed at summary judgment at the district court level. This case starts with a woman named Delaine who says, who alleged over 9-1-1 that she saw some neighbors, some black neighbors, arguing that somebody had a gun. Important in that is there's no claim that there's any criminal activity. There's no claim of assault. There's no claim that anybody other than one person, a black heavyset male with a white t-shirt. You may possess the firearm. The actual dispatch says three black males that live at the corner house by the alley are outside arguing, one displayed a gun, one with gun, black male with white t-shirt, heavyset, another black male wearing all blue. Now, what was left out, unfortunately, in the actual phone call, she said that the person wearing all blue had long dreadlocks. But that did not get relayed to the officer, so I don't think that he can be blamed for that. Okay, so what essentially he had was, and I hate to say it this way, but it basically, he had three magic words. He had the first two, black male, and he had gun. And at that point, Officer Richardson takes off and Officer Jupin take off. They come to the area where they're and it's very clear when you watch the, listen to the audio and watch the tape. This woman says, one person went around the corner, white shirt as she's pointing at her at the shirt, and black pants, and then she says, black, blue, and Richardson takes off. There's no indication, two people. Okay, there's no indication that anybody other than this black heavyset person and a white t-shirt may have been involved in any kind of criminal activity. There's certainly not, as is required under a Terry brief investigatory stop, there's clearly no criminal activity afoot with these two people that happen to be just walking down the street. They had actually gone to go get a soda and were on their way back to where they live, but there's nothing the way they were walking. There's nothing they did that was suspicious. They get Officer Richardson stops, and this is another disputed area. The district court said that despite Officer Richardson's testimony, that his initial approach to them was like a request as opposed to a command. He testified to that. He later then in cross-examination said, I guess maybe it was a command, but the district court took that away. You can see it on the video, and I'd hoped that I could play the video on this portion of the argument, but apparently the rules don't allow me to do that, so I can't show you that clip. I can just beg you to watch it. Help me a little bit with this, which is I want to just go based on what you just said, which I presume is in a light most favorable to the plaintiff here, so you have them called because there's someone with a gun in a group of three, black male, as you say, and then when they get to the scene, they say went around the corner, and I presume that the officer went around that corner, and I understand that it was a single person, and then he sees two people walking and requests that they stop. Now, I don't know if there's anyone else around the corner, but isn't that enough for, you know, we're talking about a Terry stop, reasonable suspicion, and if not, why not? Okay, first of all, I don't believe so because there's no indication that those two people were involved in any criminal activity or any criminal activity was afoot with them. If anything, if there had been some type of an assault and it involved this person with a white t-shirt and black pants, they're potentially victims as opposed to somebody that was involved in this three-person argument or dispute. Well, couldn't the officers have made a reasonable mistake? I mean, I guess that's what you really get to with regard to qualified immunity is, you know, they just made a mistake and it was reasonable because they were pointing in that direction. Yeah, but to me, the reasonableness of that is I stand outside of a bar and I'm a police officer, I watch somebody get in their car, and well, god, you know, I think that's pretty reasonable for me to say drunk driving. I mean, I get that arguable probable cause is what it is. I mean, and it's less than ironic that we talk about arguable probable cause in a profession that argues for a living, but that aside, we're talking about what a reasonable police officer believed that there was criminal activity afoot with two people that weren't identified as being criminal activity. So are we talking about arguable probable cause or is this arguable reasonable suspicion in the sense that it was just a terrorist attack? I don't even know if we have cases talking about that, but is that the standard? It's arguable reasonable suspicion, and I think it's also important that any criminal activity that would have occurred at that time was already over, okay? Because the case law, and there's a United States Supreme Court case that kind of changed the rules. It's United States versus Hensley, 469 U.S. 221. Prior to that time, you could not make a Terry stop based on a completed criminal act because that was left for regular police investigation. What you could do then after post-Hensley was to make a Terry stop if it was post a felony act, right? There's no allegation of any felony account. Now, even in the judge's description of what he thought potentially criminally had occurred prior to this, he lists misdemeanors, and that clearly isn't covered by Hensley. So the idea that they can make a reasonable stop based on a misdemeanor that already occurred, I think, flies in the face of what a Terry stop is because a Terry stop is generally based upon this idea that, look, as a practical matter, police cannot always take the time to get a warrant to do things in short shrift. It's just impractical. So we allow this minimal intrusion, as it's called, to conduct an investigation. Now, this was not a minimal intrusion. It started off as a mere request, and I think that's clear, as I pointed out earlier, from the audio itself. He says, stop, stop, yeah, yeah, you know. And in a matter of two seconds, the gun's out and he's screaming. He went from zero to 180 in about two seconds. And you'll see the interaction. They go, I mean, they're stunned. They don't know what's going on, obviously, because they weren't involved in any criminal activity, but they're down on the ground within a matter of seconds. And then they're screaming, face down, face first, face first, getting screamed at from two different directions. And they go face first, and they offer no resistance. I know this is in flight, but is the fact that they didn't pay attention, respond to the officer, feed into the reasonable suspicion? And by the way, I'm not thrilled about, you know, about our case law. Terry stops, says you can pull a gun and throw somebody on the ground. But that's a different issue. I'm just trying to figure out if we have reasonable suspicion here. No, I don't think they have reasonable suspicion, because one, it's got to be a particularized reasonable suspicion. Here, they don't have, I mean, this is just like saying anybody in a crime, in a high crime area can get boarded to the ground because you're in a high crime area, because they don't know what crime occurred. They don't even know if a crime occurred. They don't take the time to even ask these guys, hey, I mean, it's immediately the gun comes out and get on the ground. To me, that transformed the Terry stop right at that moment to an arrest, because we're no longer talking about a minimal intrusion. I dare say anybody that's had a gun pointed at them and been screamed at to get on their face and then been handcuffed face down into the pavement would call that a minimal intrusion. Now, there's case law that says, well, you can use handcuffs. But this is, you'll see it, it's much more than that. It's get down the ground, face first, handcuffs, and then there's no investigation. They're never asked about any kind of assault or any gun or anything like that ever throughout the entire period. Because at that point, they see the guy with a white t-shirt and take off after him. So I think the bottom line here is it cannot be Terry because it's a completed misdemeanor. It cannot be Terry because there's not reasonable suspicion, but the reasonable suspicion has to both be for this type of a Terry stop of criminal activity and of imminent danger. And there's nothing to indicate that these two gentlemen posed any kind of imminent danger. They're not walking normally. They just, what they did is they waved the police officer up. And it's established that there's an A circuit case, small versus McChrystal. And then there's Hoyland versus McMonomy, all that indicate that, look, if I just say no, and I do a passive resistance. Is this different saying a direct stop versus, hey, can I talk to you? Is there a difference there between sort of what, whether or not it's a request or a command? You're exactly right. There's a fact issue on that. Okay. And that fact issue got glossed over by the court because the officer himself indicated at the beginning that it was more of a request. And then when they blew him off, that's when he made it a demand. Okay. And so you're saying when he, when the officer then later said, no, I guess it wasn't a request. You're saying that that's an impeachment kind of thing. The jury, a jury would have to decide whether he was, he meant it as a request or his later testimony was correct that he meant it as a command. And watch the video and watch the video because I think those things go hand in hand. Now, I'm not going to address the issue of the city because I think it's very clear in the briefing that if there was a constitutional violation, then the city then condoned it and ratified it. So I'm going to leave that for the brief. But the idea here is it got transformed into an arrest without probable cause because clearly there was no probable cause to arrest. A, but before that, there's no reasonable basis for the stop. And Terry doesn't apply because there's no particularized crime that occurred and there's no reasonable suspicion that they, that these two people are dangerous at that time. If you don't have any questions, I'd like to reserve the balance of my time. You may. Council, we're prepared to hear from you. Thank you. May I please support Mr. Fergus? I represent multiple clients today, those being City of Cedar Rapids itself, Cedar Rapids Police Chief, Wayne Dermott in both his individual and official capacities and officers, Tyler Richardson and Jared Juppin in their official capacities. As a preliminary note, the court may be aware of this, but there's a closely related case that was heard this morning by Division I judges. On behalf of the city, I want to ask, in all of our clients, we ask that this court affirm in each and every respect the lower court's well-reasoned, detailed ruling of every issue raised in the first amended petition in this case. I want to make sure that I have stated two of the various factors that gave rise to reasonable suspicion in this case. First of all, and this first factor goes to the urgency with which the response had to be made, there were three black males reportedly involved in a disturbance outside. It was ongoing according to dispatch information. A weapon was reportedly seen, which by the way doesn't mean that there were not other weapons, and which by the way could reasonably lead a police officer to infer that there would be other weapons also. Also, we only had one snapshot from what the signal caller observed, so the officers, again because the nature of the potential crime, they had to assume, they had to make certain inferences about potential danger that they might be encountering when they responded. The, as I mentioned, the disturbance took place outside. It was not inside a house, thus there was an opportunity to corroborate or find, to confirm or dispel suspicions about the people having been involved in criminal activities. Clothing descriptions in the aggregate were such that Mr. Irvin reasonably can be said to match those aggregate descriptions. The individual who flagged Officer Richardson down at the scene, as Judge Strauss pointed out, that individual directed the officer to a particular spot, and he arrived at that spot just moments after being directed there. Bates could have been the third black male involved, and I should pause and say that the city is mindful of the fact that there was a mistake made here, but the question presented is not, well, there is no right, as a matter of logic, I guess, there is no right to be free from a potential mistake so long as that mistake is again asked to emphasize why that mistake was reasonable in this case. What role does the sort of the brush off, the walking in spite of the sort of stop, stop, that seemed to be kind of the moment when things escalated. Was that sufficient then to take the two men down on the ground? I'd like you to speak to that, sort of the degree of force that was then used in light of that interaction. Yes, I appreciate the opportunity to speak directly to that. So again, given the nature of the offense that was potentially in play here, and I want to speak, before I forget, I want to speak to the fact that they were walking calmly down the street when Richardson encountered them. However, a couple of things, there was the inherently dangerous nature of the potential crime. There was the fact that the officers are trained and make the information in their depositions, in affidavits, in a deposition of Captain Furnish, that they are to be prepared for additional guns when there's one gun present. So, the first utterance by Officer Richardson was stop, stop. There's a different tone than there was subsequent to that, but he did attempt to say stop without using any force whatsoever. Then he clarified to whom he was speaking, saying you, you guys, or yeah, you guys. And so, when the other individual, not the plaintiff in this particular case, when he turned around and waved them off and turned, at that point, Officer Richardson gave a more stern command, which is not, I mean, you can't lose sight of this. Officer Richardson did make a second set of commands of stop right now, stop. He was not, he was using his hand. He was not using his gun at that point. So then, when he sees them continue to walk, they're about to go out of view. And so, he had to gain immediate control of that situation. And yes, it is unfortunate that he was forced to raise the gun, but, or draw his weapon. But it's also part of the record that when he went to stop the third person that he, that had been described as the individual displaying, known to have displayed a gun, that individual stopped immediately. And at no point did Officer Richardson draw his weapon as to that individual. So, that had to escalate to a display of his weapon. So, that is, there is case law cited in the briefs about why even in an investigatory stop, the display of a weapon may become necessary, depending upon the circumstances presented to the officer. If the situation is dangerous enough, then the display of a weapon does not, it's not unreasonable, and it does not change the stop into an arrest. So, in this particular case, the detention then occurred, obviously, as soon as either a request or a command was given. And I want to point out, too, that the district court actually construed the record in the light most favorable to Mr. Ervin, in that the district court treated it as a request. And I may be able to find the page, but certainly, yes, it's page 19, but in the appendix, it would be page 20. So, the original pagination is 19, but page 20, the court notes that plaintiff and Bates did not stop immediately upon Richardson's request. So, then the conduct that followed that request served to strengthen the reasonable suspicion for the stop. Now, so, either the stop was initiated with the first, the Terry stop was initiated when Richardson said, stop, stop, and for reasons I started out describing, there was reasonable suspicion for a stop at that point, or it was merely a request, and the failure to comply with that request, while not sufficient on its own to generate reasonable suspicion, can contribute to or add to reasonable suspicion. What about the fact, counsel, that once there is a stop, the gun is already out, the plaintiff's put face down, and I realize the duration of the stop isn't particularly long, it's 12 minutes, which is much shorter than the one we just heard, for example, but still, that starts to look a little like an arrest to me. So, maybe you could address that point, and I'm hoping our counsel makes that point. Yes. So, again, relying on cases that are cited in the brief that say that even during an investigatory stop, police officers can act reasonably by securing a detainee or a subject with handcuffs and a weapon. Now, they were not face down as is asserted in the brief, and again, I agree with plaintiff's counsel that the arbitrator videos are critical to a determination de novo of whether there was relying on those cases. I'd go on to point out that Officer Richardson left the scene as quickly as possible to go after the third individual, so he was conducting an investigation. Contrary to Mr. Frerichs' characterization of the record, he was conducting an investigation. He did question Mr. Brocks, who cooperated, and so they didn't question Mr. Bates or Mr. Irvin, because at that point, they had another lead, and they needed to just maintain status quo. Meanwhile, Officer Drupin couldn't go around the area to do any investigation. He needed to remain with those officers. You'll see as soon as he receives backup, he speaks to a second bystander, and that bystander articulates that Mr. Bates and Mr. Irvin were not involved in the earlier disturbance, and so almost immediately upon getting her information, they were released from the scene. That was the least intrusion possible. So you mentioned there was another officer that remained with Mr. Irvin and Mr. Bates, and one of the things that strikes me about this is they never asked either of them, did you have a gun? Do you have a gun? Did you display a gun? Any of those things, so there doesn't seem to be, at least during that time when they're looking at the other lead, there doesn't seem to be any investigation going on. There's an investigation of someone else, but not of these two individuals. Well, the video and the audio reflect that Mr. Drupin was, Officer Drupin was alone for a time, and during that time, Mr. Bates, although he's not the plaintiff, he was very volatile, and so I don't think it was reasonable for the officer to expect any cooperation in answering questions. But also, if they had started asking questions, when they had other means of investigating, if they had started asking questions, then it would have been an arrest, and they wanted to just maintain the status quo for a short time while they could, and that's reasonable. They wanted to get to the person who was expressly described as having carried that weapon, and Officer Drupin was on his own. He had to just sort of maintain the scene. So, I also want to point out that the argument that's been presented to this court about, and is included, I think, in the reply brief, about what the individual, the first bystander who flagged down Officer Richardson. Mr. Irvin's counsel has offered some screenshots and argued that that makes it unreasonable for Officer Richardson to have considered Mr. Irvin one of the three people he was looking for. Well, first of all, that argument was never presented to the district court, so I'm not sure it's appropriate to if you look at the, if you look at those two screenshots, then hopefully you'll also look at what she did as she was, as Richardson was pulling away. He asked black, I'm sorry, he asked white shirt, black pants. She originally had said white and black pants, and so Officer Richardson wanted to clarify the color of the shirt. He asked white shirt, black pants. So, yes, at one point she was gesturing, arguably anyway, gesturing to her top and her bottom, but then she argued, or then she gestured in response to the request for clarification, white and blue, and her hands were not. So, again, viewing this not with hindsight, because that's 2020, but viewing it from the lenses, the lens of a reasonable officer trying to make decisions quickly in order to defuse what was potentially a very dangerous situation and then take it in context as a whole under the Quinn case and in many other cases, the officer was not unreasonable in believing that Irvin matched the aggregate description when coupled with the proximity in time and space, not only to the disturbance, but also to the bystander who directed him. I see my time is almost up. I'd be happy to entertain questions. I see no more, so thank you. Thank you. Roberto? Thank you. First of all, you cannot strengthen reasonable suspicion by what happened later with somebody else, okay? Reasonable suspicion occurs at the time, not based on how somebody else reacted to an inquiry about, hey, can I talk to you? And that doesn't have any bearing on this case despite invitation after invitation, yet to hear what criminal activity was occurring. What's the crime? I mean, the judge extrapolated out maybe an assault, but nobody said they saw an assault. Nobody alleged they saw an assault. And this whole idea of disturbance, disturbance wasn't reported to this officer. It was an argument. So this whole idea of the immediate danger is not from the criminal activity, and I would suggest it is because of those three words, a black man and a gun. You know, 1983 has been designed to protect people from the government, from intrusions by their government. Justice Thomas has looked at qualified immunity with severe skepticism, and the Supreme Court keeps dodging the issue of whether qualified immunity should even still be around. It is really a stepchild of Jim Crow. But what qualified immunity does, as opposed to 1983 law, qualified immunity now protects the government from its people, as opposed to the protections we should be getting from our government. And I think under those circumstances, look, if you watch the video and you watch what's happening to these people, you cannot say this is a minimal intrusion. I mean, if you've ever had a gun pointed at you, and you're young and you're black and you're male, if you're young and you're black and you're male, whether you've had a gun pointed at you or not, you know that happens, and you know what happens when you deal with police. And it doesn't happen with all police, but that's a fear that exists. It exists in this case, and it's the kind of thing that we don't make a statement with this case. We're just saying, pull over anybody, pull your gun out on me, get them on the ground, treat them like an enemy combatant, and that's not right. Thank you. You don't know as long as you don't have any questions. Thank you very much. I see none. Thank you.